Well, here are the next case, United States v. Asch. Good morning, Your Honors. May it please the Court, Brian Lancio for the appellant, the defendant below, Robert Christopher Asch. This case involves a man who had admittedly disturbing, violent, even grotesque sexual fantasies that many of us, I think, would have difficulty fathoming. But he chose to engage in those fantasies over the Internet with like-minded individuals, often through a website that was designed for fantasy-seeking, like-minded people. Mr. Asch has now been convicted of two conspiracy accounts based on his — It wasn't just over the Internet. There were phone calls, there were meetings, there was purchasing of equipment, right? Yes, Your Honor. There are a number of different facts here. There were at least two in-person meetings between Mr. Asch and his two co-conspirators in the first charged conspiracy. They did not all three meet together. Mr. Asch did meet with an undercover agent who was posing as a like-minded individual. There were certain gathering of materials, as Your Honor said. But the government's burden here was to show that beyond a reasonable doubt that Mr. Asch had the intent to actually go forward, to actually engage in the heinous sorts of acts that he was discussing. Isn't that quintessentially a factual question? Don't you agree? Whether they were fantasizing or whether they actually intended to do this? Yes, Your Honor. I think the factual question — And the jury heard the evidence, heard the arguments, and made a finding? You're correct, Your Honor, that the jury did hear the evidence. They did make a finding. However, the standard here is that if the evidence equally or almost equally supports a theory of innocence as it does guilt, then — and that was the standard articulated by this Court in the Gilberto Valley case. And it goes back a long way. Lorenzo, D'Amato, there are a number of cases in this circuit. If that equipoise exists in the evidence, then there is no basis for the jury. I think while the government maybe infelicitously wrote on page 25 that Judge Gardefee found that the jury could have accepted them and it was equally reasonable for the jury to do as it did and draw competing inferences, that isn't what I read Judge Gardefee to be saying. I think that he was saying the jury was invited to find one way or the other, but it reasonably found and could find beyond a reasonable doubt, as it did, that Mr. Ash had the requisite intent. Do you have a place in Judge Gardefee's decision where he said it was equally reasonable for the jury to convict or not convict, or to find intent or not intent? Off the top of my head, I do not, Your Honor. I apologize. Yeah, I don't think he said that. I think that was just the government's, as I said, infelicitous characterization. I think Judge Gardefee, in his very lengthy and careful opinion, found that the jury's finding beyond a reasonable doubt was amply supported. Do you have anything to the contrary? I would disagree that the government's take was infelicitous. I think that they I'm sorry, you would disagree what? That the government's take on the inferences that could be drawn was infelicitous. I think that they sort of made an omission there and revealed that the evidence, once it was reviewed, is not such that you could only, beyond a reasonable doubt, infer the intent. Of course, we're not reviewing what the government said here in its brief. We're reviewing what Judge Gardeefee said in declining Rule 29 and Rule 33, right? Correct, Your Honor. That's correct. We are reviewing Judge Gardeefee's decision. And I believe that decision, it does illustrate our position, in fact, that the inferences to be drawn from the facts, the evidence that was presented, are, you know, they're almost equal. If not, in fact, we would submit that they tend to show more that Mr. Ashe was engaged in fantasy and role play. And I think there are a number of sort of factual aspects of the case that are very similar to the Gilberto Valley decision, where Judge Gardeefee also overturned the jury's verdict on the conspiracy count, and this Court affirmed that decision. And those aspects are really related to the sort of the concept of the vanishing plots, that just is one example, where in Valley, a number of times, he and his alleged co-conspirators set specific dates where they were going to meet and carry out their plan. And then those dates would come and go, no one would talk about it, and they would pick up discussion a few days or weeks later and say nothing about the missed meeting. And Judge Gardeefee . . . Your response, I mean, in Valley, Mr. Valley didn't know the identities, the actual identities of the person who was in England, and there was another person in Australia. He never met with anyone in person. They didn't have any reality-based interactions with each other about. They had met numerous times, or several times at least. They knew each other's identities. They knew each other's lives. They made purchase of . . . Mr. Ash made purchases of equipment. I mean, there was a . . . they visited sites. They made very specific kind of plans in the real world, as opposed to just being all on the Internet and anonymous. Doesn't that distinguish the two cases significantly? Your Honor, I think that is a distinction, but I think, you know, there are two real reasons why that's a distinction without a difference, really. The first is that the idea that talking on the Internet is somehow, you know, not in reality, not in the real world . . . Anonymously. Anonymously. Anonymously, yes, but I don't believe that there's a specific requirement in charging a conspiracy that you know exactly the true identity of your co-conspirator. If you reach the agreement and have the intent, then that is sufficient. And here, it's true that Mr. Ash is the alleged co-conspirator. But again, the idea, to quote Judge Gardefee, is that it was inconceivable that co-conspirators who actually possessed the requisite intent would make a plan, set a specific date, and then never, you know, never follow through on that date, and then would never come back and talk about it. And here, in Mr. Ash's case, with respect to the first charge conspiracy, there were a number of opportunities where not Mr. Ash, but the other co-conspirators offered to him, oh, do you want to meet in June? Do you want to meet in July? And he offered excuses, frankly, as lame as, my cat is sick. And our argument is that, you know, it's inconceivable that someone who would want to actually carry through with these heinous acts would be put to pause by a sick pet, that they would turn down the opportunity offered by their alleged co-conspirators to go forward. I think that is very much in line with the rationale that underlied the vanishing plots theory in Valley, and that was really central to Judge Gardefee's decision in that case to set aside the jury's verdict. Now, the other aspects about purchasing items in the real world, again, we don't think that this is any different than purchasing props to play out a role-playing fantasy. It's, you know, people go to medieval fairs, there are, you know, so-called LARPing, live-action role-play. The key to conspiracy is the agreement, right? And here, there certainly was evidence of an agreement, and then not only just the steps towards carrying out the agreement, that's all in the record, isn't it? I think the evidence in the record shows that there were discussions of plans, there are some, and there is evidence that there was a lot of disagreement, actually. A lot of non-agreement, equivocation, as I mentioned, Mr. Ash would be, you know, excuse me, Mr. Van Eye is one of the co-conspirators, would send Mr. Ash certain scenarios that he wanted to apparently carry out, and Mr. Ash would say, no, that doesn't make sense, you know, I don't think so, or, you know, I have a sick pet, I'm not available, I don't want to do it, what about, let's talk about something different. And they never really honed in on any specific plan about, again, the idea of the agreement behind a conspiracy is there has to be some level of specificity about what is to be done. How much specificity does a law require for a criminal conspiracy? I mean, it's not like a contract case where you have to have an agreement, a meeting of the minds on all the material terms? I mean, what does the government need to prove for a conspiracy? Your Honor, you're right, it's not a contract, but there does have to be some meeting of the minds and some amount of specificity as to an agreement about, you know, that covers the basic elements of the underlying offense that is supposed to be the object of the conspiracy. And here, the discussions were so fleeting between women, children, this location, that location, that date, that time. Is that what you're talking about? So as to the second, as to the conspiracy involving the FBI undercover agent, where Mr. Ash traveled to Allentown, Pennsylvania to attend a gun show, and purchased a high-voltage taser, having withdrawn money in New York first, and having inquired of Mr. Meltz where he could buy such a taser to incapacitate a victim, and were there a series of conversations in the space of a couple of months about an individual particular person? No, Your Honor, the second conspiracy is admittedly different. The only co-conspirator there was Mr. Meltz, and the evidence that was adduced at trial indicated that not only did he never agree to go forward with any of the offered up plans and opportunities, but he also expressed the opinion that he didn't know, he had no idea whether Ash was serious or not. And I know there was, there is in the record, a lengthy dispute about a recording that the jurors, and allowed them to hear the tape multiple times with competing transcripts, but one aspect that was consistent through all of the transcripts, and was corroborated by the government's witness, Agent Spivak, during his testimony, was that at the outset of the conversation, Mr. Meltz said, I don't know if he would do this. And so it's that evidence that speaks directly to Mr. Ash's intent, and the ability of the two of them to form a conspiracy. The conspiratorial agreement can't be formed if you don't, if the other person is merely pretending. And the idea that he didn't know, suggests that he wasn't sincere, and that there was no agreement there between them. He pled guilty, didn't he? Didn't Meltz plead guilty? Yes, he did, in a separate. No matter. Okay. All right, let's hear from the government. Thank you, Your Honor. We'll have some time for a vote. May it please the Court, Juan Shin for the United States. Your Honor, this case is starkly different from Valley, and the evidence here was abundant. It was not an equal poise, as Judge Gardoffy found. So, the critical points of Valley, as this Court explained. You're saying Judge Gardoffy did not find that it was an equal poise? Correct. He recited the equal poise standard, and that's at page 50 of the special appendix. And then he went on to uphold the jury's verdict. And so, he did not find that the evidence was an equal poise. He did not find that it was equally reasonable either way. He found that the jury reasonably concluded. That was a misstatement by the government. In that brief, yes. Yes, Your Honor. So, getting back to the point about Valley. So, this Court's decision in Valley really turned on the combination of two things. First, the relationships among Valley and his alleged co-conspirators was entirely virtual. Here, as the panel has already seen, the two of them were not online, but they moved quickly to, first, the phone. There were repeated calls between Ash and Van Hise, and Ash and Meltz. And just to be clear, Your Honor, I'm focusing at the outset on count one on that conspiracy. And so, those repeated phone calls are significant. And in fact, Ash himself said later on to Darren, the undercover agent, he said that he judged potential recruits' seriousness based in part on their willingness to get on the phone. Because only folks who are serious were willing to get on the phone and go beyond the virtual world of the Internet. But could you talk about, I mean, they never, Mr. Ash, Meltz, and Van Hise never really agree on a specific day or even a general time frame. They don't really agree on methods. They talk about, you know, whether it'll be the wife, whether it'll be the sister-in-law, whether it'll be one of the children. That seems very kind of, you know, free-ranging and not only lacking in detail, but not concrete even. Could you address those concerns, please? Your Honor, a couple of points. First is, it's well-established that a conspiracy only requires agreement on the essential nature of the plan and not on particular details. For the identity of the victim, for example, that wouldn't be part of the essential nature of the plan? In fact, that's right, Your Honor. So this Court has held—this point wasn't raised in the appellant's brief, and so we didn't respond to this point in our brief. But this Court has held, in analogous circumstances, that the identity of particular victims or particular target property to be destroyed, those are not elements of a conspiracy. So, for example, in U.S. v. Mulder, which is 273 F. 3rd 91, a Second Circuit 2001 decision, this Court said that the—and I'm quoting—the identity of the targets of a Hobbs Act conspiracy is not an element of that conspiracy. And it explicitly rejected the argument raised by the defense in that case. But there's so much lacking. I mean, you don't have the identity of the specific victim. You don't have when, where, precisely how. I mean, they're talking about it, constantly talking about it, but they never really—I mean, if this were a contract case, you would say it's unenforceable because they haven't reached agreement on the material terms. And so what do we—I mean, that gives me pause. That leads to my second response to Judge Carney's question, which is that they actually did agree on the essential parts. So here, this was not an open-ended agreement to kidnap anyone in the world. So, as I said, the identity of the victim is not required. But actually, the jury here was instructed that the conspiracy here was a conspiracy to kidnap one or more of a very small number of people. So, Bolas Van Hise, that is Mr. Van Hise's wife, his stepdaughter, Sherry Davis, that's his sister-in-law, or Sherry Davis's children. There were four children between the ages of one and nine in that group. So there was a limited group of people identified in the jury instruction, and so the jury had to find that the agreement was based on that objective. Well, did the jury have to agree on any particular one of the six? I mean, suppose you had four jurors agreeing on one and four on another. I mean, is that sufficient? That is, Your Honor. So, again, because the particular identity of a victim is not an with respect to the particular victim here, just as in other circumstances. So, for example, in human trafficking and human trafficking cases, in gun cases, there's no need to be unanimous about the particular gun. And so here, there was a particular set of people, and there was ample evidence that the agreement was with respect to those people in particular. And so there were numerous exchanges and conversations among Ash and his co-conspirators, Van Hise and Meltz. Much of that focused initially on the sister-in-law. And so, for example, there was discussion about it. Photos were sent by Mr. Van Hise to Mr. Ash and Mr. Meltz. That initial discussion included the sister-in-law, the children. So, again, photos were exchanged. This began in March of 2012. Toward the summer, Mr. Van Hise's focus expanded a little bit to include his wife as well. And so there was a discussion among Van Hise, Ash and Meltz about whether they could kidnap and rape and kill Van Hise's wife as well. And there was discussion about that, but ultimately there was agreement. Counsel, the government had to prove that they agreed on the essential nature of the plan. What was the essential nature of the plan? So the essential nature of the plan was that one or more of this small subset of individuals in Mr. Van Hise's family, they would be kidnapped. They would be taken to a location. There was discussion about potential locations like the woods or actually there was a specific discussion about Mr. Meltz's basement, which is a place that Mr. Ash actually went and visited. And they had a discussion about how Mr. Meltz had previously killed two people in that basement. So there was a discussion about using that as a potential location. So kidnapping one or more of the family members, taking them to some remote location and then ultimately raping, torturing and killing them. Now there was lots of discussion about different ways they could rape, torture and kill those people. But I would submit that the particulars of how they would go about torturing the victims, for example, that is not a requirement for the essential nature of the agreement. So any of the various ways that they discussed torturing these victims would have fit within the essential nature of the plan, which was kidnap, and then ultimately rape, torture and kill. Could you address the vanishing plots problem? In Mr. Valley's case, we found that persuasive evidence that there was no follow through. This was just all imaginary. And here Ash and Meltz agreed to meet October 10 or sometime but never did. Ash tells Van Hise that he and Meltz are free on October 26 and then there's no follow up. Why isn't that equally persuasive that they were not really intending to carry through and they never really reached an agreement? So Your Honor, the vanishing plots issue, the concern there that was identified in Judge that the agreed upon dates came and went without comment by the co-conspirators, that reflected the fact that they didn't really agree or intend to commit the crimes. So if there had been real agreement about a particular date, then if that date were missed, then you would expect to see some discussion about that and concern or objection about it or some complaint. Here, we didn't get to that point of agreement on a particular date. And again, that's not required. Valley does not stand for the proposition that agreement on a particular date is required in a conspiracy. But I'm asking really because they were mentioned, they agreed to meet October 10 or sometime but never follow up and don't meet then and offer to meet on October 26 and that's just ignored. That would be rude in the ordinary context. Right. Well, I think the October 26 is readily explained based on the record by the fact of Mr. Valley's arrest which occurred on October 24th, I believe. Not Mr. Van Hise. You said Mr. Valley's. Mr. Valley's arrest. Oh, that's right. Arrested on the 24th. Right. And so these individuals were aware of that and so one would expect when some high profile arrest of someone who Mr. Van Hise was actually speaking with, if that occurred, that they would lay low. So that's readily explicable. I would point out also that what this court emphasized in Valley is that a plot vanished and then they just moved on to someone else. So a woman named Sauer was one of the victims in the Valley case that was discussed at length. And then ultimately, after the lunch meeting that was described in that case, ultimately they ended up dropping it. Here, however, you don't have that. There's no moving on to someone else among Mr. Ash and the co-conspirators. Their discussion was always focused on that small group of members of Mr. Van Hise's family. And so what you have here, Your Honor, the two concerns that combined in Valley that led to this court's decision were the entirely virtual nature of the relationship, combined then with the fantastical on their face discussions. So that's something we haven't really gotten into here. So the Valley decision focused very much on this agreement to kidnap three women in three locations, so Ohio, New York, and India or Pakistan. They had agreed to kidnap all three on the same day and that just on its face was purely fantastical. Also, there were other fantastical elements that this court mentioned and focused on. So for example, the discussion of human-sized ovens and rotisseries, which there was no evidence in the record that anything like that existed. So it was the combination of the nature of a plan that was purely fantastical on its face with the completely virtual nature of the relationships that combined and led to the result in Valley. Here, both of those elements are missing because there's ample evidence of a realistic plan that was not fantastical on its face. So again, ultimately the plan was realistic. There were identified individuals that were actually Van Hise's family members. He shared photographs. He shared the street on which Sherry Davis, the family, there were two real victims identified as well and photographs shared. So that doesn't really distinguish. It does in the sense that we're talking about numerous realistic elements, but in the absence of that utterly fantastical element here. Ultimately, there are discussions about particular ways that they would go about executing that plan. So again, they were talking about grabbing Mr. Van Hise's wife or sister-in-law or children in the neighborhood of Trenton where he lived in that particular area, about taking them to real locations like Mr. Meltz's basement, or the court will recall that Mr. Ashe actually visited Mr. Van Hise in Trenton and they went around and visited places where they could dump bodies. So again, these are realistic elements and there's nothing in the record comparable to the completely fantastical, literally impossible things that the defendant and his alleged co-conspirators were discussing in Valley. So you have all of that combined here and so both of those elements here actually amply support the verdict on count one. I see I'm over time. Unless the court has specific questions with respect to count two, I'm prepared to rest on my briefs, but I'm also prepared to respond. Thank you. Just a few brief points, Your Honors. First, with respect to the distinction between the Valley case and the idea that it was all virtual, I think the government is really underselling the fact that in that case, Gilberto Valley illegally entered into a number of government law enforcement databases, acquired individual potential victims real, personally identifiable information, and talked about how he had that information. I understand he didn't share certain aspects of that with his co-conspirators, but he did in the real world access this personally identifiable information about real individuals. As Your Honor pointed out, he shared photos of certain victims. He had an in-person meeting with one of the potential victims in which prior to the meeting, I believe it was a lunch, he told one of the co-conspirators that it was going to be happening, that he was looking forward to it. And then immediately thereafter, he logged on and he reported back on how that meeting went and used phrases to describe how he could barely control himself and so forth. And I think the circumstances with Mr. Ashe are so different from that in that he never, as the Court has pointed out, they never circulate around a particular victim. Mr. Ashe never comes close to any particular victim. He never has a meeting with anyone. The most they did is in the second conspiracy, he sat with the undercover agents on a bench in downtown Manhattan and observed another undercover female FBI agent walk out of an office building and onto the subway. And those are the sort of activities that occurred here in the real world that are very different from gaining this personal information from the law enforcement database, meeting with an actual victim, reporting back on how that went. The other thing is I'd like to address quickly is the vanishing plots again. I think that it's very important that the Court understand that there are many of the meetings that were set in, that were supposed to be set in the case of Mr. Ashe's co-conspirators, they went by without comment. And the government pointed out that, you know, they didn't even get to that point in some respects because these guys couldn't even agree to have meetings. They would, you know, turn each other down left and right and they would just move on and start a new conversation about a different fantastical scenario of some victim that they were going to get to. Being that I'm over time, if there are no further questions, we'll rest. Thank you. Thank you. We'll reserve the session.